You may proceed. Yes, Your Honor. Lynn Butler on behalf of the Montana Department of Revenue. I'd like to reserve two minutes for rebuttal, please. Your Honors, may it please the Court, this is the appeal of the affirmance of a bankruptcy court's dismissal of an involuntary petition out of the District of Nevada. There are two issues that are before the Court. One has to do with the eligibility of the creditors. The second has to do with the actual creditor pool of the debtor as it existed on the petition date. I'd like to begin with the eligibility of the creditors because it affects, ultimately, whether the number in the creditor pool has materiality to the decision. What we do, Your Honor, we are asking the Court to affirm its prior decisions in three different Ninth Circuit cases. One, Enri Marciano at 708, Fed 3rd, 1123. One at Vortex Fishing at 277, Fed 3rd, 1057. And one, Focus Media, 378, Fed 3rd, 916. When the original petition was filed, there were three petitioning creditors. Montana Department of Revenue, Idaho State Tax Commission, California Franchise Tax Board. All three at the time believed and swore to in the petition that they had undisputed claims eligible to be involuntary petitioning creditors. Prior to trial, the Yellowstone Club trustee signed on as a joining petitioning creditor. Once accepted, that becomes one of the petitioning creditors, so you have four. I'd like to start with the Yellowstone Club trustee. It's the easiest to dispose of. The bankruptcy court held that it was eligible as a petitioning creditor under Marciano. Why? Because it had an unstayed final judgment on appeal. Also, Your Honor, that point is not before the court. It was not appealed from the district court. And if you look at it, if that point were to be won by Mr. Blixeth, it would be enlarging his rights and restricting our rights because it would reduce the number of creditors. So I submit, Your Honor, it's not properly before the court. That's one creditor. The next I would submit, Your Honor, would be the Idaho State Tax Commission. Idaho had a final, non-appealable default state court judgment. That judgment, though, if you look at the basis, was the filed, sworn, self-reported tax returns of Mr. Blixeth. They were filed of record. He refused to pay them. Finally, the Idaho State Tax Commission filed a lawsuit. He did not answer. Why? Of record, he admitted on stand that under the advice of counsel, he failed to answer. The judgment was taken. There is nothing objectively in the record that shows there's any dispute as to that liability or that amount that arises out of those tax returns that are memorialized in that judgment. That would be claim number two. The third, Your Honor, would be the California Franchise Tax Board. That liability was based upon the 2007 self-reported, filed, sworn to tax return of Mr. Blixeth. That liability, although no judgment was taken, the record before the court shows multiple attempts by the State of California to try to collect that liability. The last indication of what – I'm sorry. I just want – I want some clarification. Yes, sir. You say that it's a self-reported tax return. You're saying that Mr. Blixeth is reporting that he owes the State of California X amount. Yes, sir. And that California isn't disputing that. They're not adding a dollar to that or – Exactly. There's nothing in the – yes, absolutely. The tax return is of record. There is no amendment in the record. There is no administrative or State – or Federal court dispute in tax court – or State court, I'm sorry – that would affect it. The only thing you have of record as of the petition date, which is required by In re Marciano, is the return itself. I thought that Mr. Blixeth actually disputed whether he owed California anything. No, sir, Your Honor. He – He doesn't. He made very vague assertions that his counsel were making phone calls to California. There was nothing objective in the record. There was no here's an amendment. I thought that in the settlement that Mr. Blixeth entered into in California that he disputed the amount. No, sir, Your Honor, for two reasons. One, under Marciano and in Vortex, the court was supposed to look at how things existed as of the petition date. Those settlements were post-petition date settlements. As this – All right. But is it – does Mr. – I don't think I got a straight answer here. No, no. Did Mr. Blixeth say that he disputed the amount at the time of settlement? There is a conclusory statement that says Mr. Blixeth disputes the amount. And is that in the settlement agreement? The settlement agreement, that was post-filing. There was no – I understand that the petition is – you think the petition is the time at which we mark this whole thing. Yes, sir. There was no dispute as of that time. The settlement is obtained later on. Yes, sir. Blixeth says I don't think I owe you this much, but I'm going to enter into the settlement anyway. Exactly. Exactly. So from Blixeth's position, it is disputed. Your position is you disputed it too late. Exactly. Exactly. Well, and I'd go farther. The burden is to show there's an objective dispute under Ninth Circuit law. They have to show something more than just the cursory, conclusory statement, I dispute. And there's nothing in record of that. And keep in mind – And what about the – I thought the dispute was more specific in terms of a lost carryback. That actually came out of the district court's opinion. Okay. And if you look at what the district court opinion looked at, was an entry in one of the internal memos from, like, 2009, that there was a negotiation that if and when Mr. Blixeth was going to file his 2008 return, they would look at it, review it, and see if there's a lost carryback. I apologize. The most telling part of the record is there's a tax due notice from March of 2011, a month before the filing, and it shows due and owing to the California Franchise Tax Board the exact principal amount that was due and owing off of the return. Are we at this point in your argument, are you talking about the required number of creditors? The number of petitioning creditors to sign the – yes, sir, Your Honor. Yes, sir. You have to get three out of four. You have to get three states and the Yellowstone Club. Exactly. Yes, sir. So if they can knock out two of those, then you're in trouble. Exactly. And that's when we would go to his creditor pool, whether he sufficiently proved up the existence of creditors. As to California, Your Honor, keep in mind that at some point in time, if there actually was a dispute, keep in mind the trial was in 2013. This is a 2007 tax return. You would have found something more in the record that effectuated the liability, which came directly off of his return, and the amount, which is easily calculated under state law. So with that, Your Honor, we would submit two things. One, the post-settlement, and keep in mind, if this court decides to open up that post-filing area for review, keep in mind the settlement with California was 100 cents on the dollar. That in itself, under Ninth Circuit law, is indicia that the claim was due an owing and that there was no dispute. The next claim, Your Honor, is the state of Montana. The state of Montana had an ongoing audit against Mr. Blixas. There were multiple audit issues. One audit issue, Mr. Blixas continually and repeatedly admitted to the liability throughout this entire process. That was one claim of many. However, if you look at the audit as a whole, it would be a partially undisputed claim of a creditor. Partially undisputed claim gets us to Vortex and to Focus Media. Under Vortex and Focus Media in the Ninth Circuit, a partially undisputed claim is eligible as a claim in involuntary bankruptcy under 303. But Congress stepped in. Congress stepped in. Congress stepped in and actually adopted the Ninth Circuit's reasoning. If you look at the language in Vortex and Focus Media, actually it's a quote in Focus Media and from Vortex that talks about a dispute as to liability and in some cases amount. A year later, Congress amends the statute and puts in end amount. Completely consistent. Also, Your Honor, under Ninth Circuit law and I believe the other circuits, in order for a change, an intervening change to have an effect on prior law, especially in the 2005 bankruptcy amendments, there were some very substantive changes to the bankruptcy code in 2005. If you look at that progression or that analysis, you'd have to show that there was a clearly irreconcilable difference made by Congress in prior law. As I stated, it's actually directly and easily reconcilable because they're using your language. Are you saying there's no dispute as to amount? As to Audit Issue Number 4? Absolutely. Yes. In fact, the only evidence of record is the Montana auditor who, on the record, calculated exactly what the amount is to the penny using the state regulations. But then that requires Audit Number 4 to stand alone as a separate liability. Yes, Your Honor. And why is that the case when you're really looking at the whole return? The evidence of record, the auditor's testimony, shows that all other audit issues were assessments against Mr. Blix's. Mr. Blix's stipulated at trial that none of the other audit issues would lower the amount due under Audit Issue Number 4. That's consistent with the testimony of the auditor. In other words, you had Mr. Blix's original 2004 tax return. You had the Audit Issue Number 4 liability that was admitted to. That is going to be your baseline. There was nothing in that audit that could have reduced that liability. Let me just ask you if you were to play this out. You've got a tax return with 52 particular items on it. Yes. And one of them is not disputed, but 51 of them are. In your view, can the one undisputed item always stand alone? It can if that is the baseline for that tax year. Let me differentiate what you're asking. If you're talking about multiple items in one year's tax return, they can have crossing effect. Sure. If you're talking about 2005 versus 2004, no. Because 2005, if 2005 were to be shown to have a credit that you would offset, and offset's another issue, the offset against 2004, then there would be an issue. Here, though, the testimony and the stipulation were that none of the other audit issues per year would have a reducing effect on Audit Issue Number 4, thereby making that one your baseline liability. I guess what I'm having some trouble with is that that's an example where it wouldn't have an impact on a reduction. But given the complexity of tax returns, where sometimes you have more than one baseline, you have different years that are imported for a variety of reasons, what concerns me about your interpretation is that you would be able to, in effect, kind of slice and dice the tax returns because you could come up with some number, or entry, I'll call it, that would, in fact, not change. Therefore, that becomes a separate item and a separate non-disputed liability. And so I'm having some trouble kind of playing that out if you were to look at other different tax issues. We would be like taking the tax returns and kind of making Swiss cheese out of them, and I'd appreciate your response to that. I would agree from the standpoint of a single-year tax return. Say you had gross wages of $100, but then you had a business loss of $99. Those are two separate items where you can't say, oh, you have $100. No, you net it out because that's that final number. That's why the issue is clearer in a post-filing audit because you always have that original return. You know what was said. And then you look at the multiple issues on the multiple audit issues, and you look at each one to see how it could affect that year. And for 2004, while there were audit issues that would affect 2004 as an increase, there were no audit issues that would affect it as a decrease. Do you want to say that you remain? Oh, yes. Yes, Your Honor. Thank you. Thank you. Good morning, and may it please the Court. Nathan Schultz on behalf of the appellee, Mr. Blixeth. It's no exaggeration to say that this has been an unbelievably strange and convoluted saga. I don't envy Mr. Butler trying to fit all of his issues into 12 or 13 minutes, and I'm not going to try from the get-go to respond point by point because there is one particular issue which, if resolved in Mr. Blixeth's favor, is enough for this Court to affirm the dismissal of the involuntary petition. That issue is whether Montana was ineligible as a petitioning creditor due to having a bona fide dispute as to liability or amount for its claim. Generally, that's a factual issue, and there's really no factual dispute here about that issue. Montana acknowledges that when the petition was filed, the audit was outstanding as to all audit years, and as to all but basically one issue, there was a pending dispute. That's 99.5% of the audit amount. And so, of course, the one issue is the infamous Audit Issue No. 4. But Montana never had a claim for Audit Issue No. 4. The Bankruptcy Code defines claim as a right to payment. Montana doesn't have a right to payment for Audit Issue No. 4. If they had wanted to get to a right to payment, there were two ways to do that for the 2004 return. One was to complete the audit as to 2004, get to a final determination as to the liability for that tax year. Another way is they could have issued a jeopardy assessment. They didn't do that, so they didn't do either of the two things that would be required to establish a liability. Therefore, even if we set aside dispute as to amount, Mr. Blixeth had a good-faith bona fide dispute as to liability for all of the audit years because the audit hadn't been concluded. But we know that, and we could stop right there, but we know that Montana makes the argument as to dispute about amount. And that hinges on this idea that if your claim is disputed as to amount but the amount that's undisputed is above the statutory minimum, then you're okay. It's sort of a materiality concept. And this really comes out of a minority of bankruptcy court opinions, and they all have really the same hypothetical concern, which is, and they use these specific numbers in the cases. Let's say I have a creditor with a $100,000 claim, but $100 is in dispute. And I refer to this as the 0.1% hypothetical. And bankruptcy judges are really uncomfortable with the idea that a $100 dispute would keep somebody from exercising their right to file an involuntary bankruptcy petition. But that hypothetical ignores the other end of the spectrum. Let's say you have a $56,000 claim of which only $200 is undisputed. Those numbers aren't made up. That's the exact ratio we have here. Montana says that issue number four was $219,000 as of the petition date, but we have a $56.6 million audit. So setting aside the bankruptcy court's concerns about is it fair to let $100 keep this out, it's at least equally important concern about whether a creditor should be able to use $200 of undisputed amount to put somebody into bankruptcy when they are asserting a $56,000 or $56 million in our case claim. There's a huge issue of leverage there. And so the 0.1% hypothetical isn't enough to justify that interpretation. And when you look at, I think, four important things about the interpretation of the statute, it reveals why the majority position is correct. Those four things are statutory construction, legislative history, jurisprudence around Section 303B, and then policy. So starting with statutory construction, we start with plain meaning. And Judge Dorsey had an extensive treatment of this in the district court opinion, and it was dead on. There's no material qualifier in the language in the statute. It says you have to be the holder of a claim that's not subject to bona fide dispute as to liability or amount. That's very clear on its face. No materiality, and there's no tie to the second part of the statute, which mentions the statutory minimum. And those two pieces are completely different in terms of purpose. We've had the statutory minimum in the equivalent code section since the Bankruptcy Act in 1898. It was $500 to start. It's $14,000 at the time of this case, now I think $16,000 today. That's really, I think, to say, you know, why should we bother with the expense and the administration of a bankruptcy proceeding if all we're talking about is a very small amount of money? The bona fide dispute qualifier is something completely different. That's about, and we know this from the next point in legislative history, that's about protecting debtors from having a creditor leverage them with the threat of involuntary bankruptcy to resolve a disputed claim. And that's powerful leverage. So when you look at the legislative history, Senator Baucus, who happens to be from Montana, said very clearly at the time in 1984 when the bona fide dispute requirement was put in that this amendment was designed to prevent creditors from using involuntary bankruptcy, and I'll quote, as a club against debtors who have bona fide questions about their liability but who would rather pay up than suffer the stigma of involuntary bankruptcy proceedings. It's necessary to protect the interest of debtors and to prevent misuse of the bankruptcy system as a tool of coercion. Two circuits, I think, have spoken to this issue post the BAP CPA amendments. Yes, Your Honor. What did they say? Both of those circuits, the first and the fifth, the first was in Festolo, the fifth was in Greenhills, agreed with Mr. Blix's position and the plain meaning of the statute that any dispute as to amount is disqualified. If Congress wanted to put in this material qualifier idea, there's a very easy way they could have written that into the statute. They didn't. And so it's not our job and it's not the court's job to question that. And I think one thing about legislative history, which we might not think of as legislative history, but I think it is, that's powerful here, is it's actually eight months from August of 2004 until April of 2005 that Focus Media was decided in August of 2004. Eight months later in 2005, Congress amends the statute. I think that's powerful legislative history. If they thought Focus Media got it right, no need to amend the statute. I guess that their response, and I appreciate your reaction as well, actually they did amend the statute. And this word amount comes out of the Ninth Circuit cases and therefore is indicative of what Congress meant. Well, sure. And that comes out of the fact that before 05, the statute didn't say bona fide dispute as to anything. It just said bona fide dispute. And so judicial gloss on that up to Focus Media and before the 05 amendments was, well, okay, a bona fide dispute, does that mean a dispute that matters? And it doesn't matter if it's below the statutory minimum. And so, yes, Focus Media talked about liability or amount, and Congress added liability or amount, but not in the way that is consistent with the way Montana wants to interpret this. So if I understand, if you could write our holding favorable to your client, not saying we will, or even inclined to, you'd say question one, is there a dispute as to amount? The answer is yes. Next question is, does it matter if the undisputed amount exceeds the statutory minimum? And you would say it doesn't matter. It doesn't matter exactly, Your Honor, because that is what the statute says. That's what the legislative history tells us, especially because Senator Baucus explained that we're concerned about protecting debtors from coercion. We hit on the jurisprudence point, and I thank the Court for raising it, that the first and the fifth are both on the side of Mr. Blix's here. And the decisions adopt the appropriate analysis. They look at the plain meaning of the statute and follow the way we're supposed to look at statutes in these circumstances. The point one hypothetical is not where you start, but that's where the minority of bankruptcy courts start. In policy, not to neglect it because I think it's important, again, policy for this was to protect debtors, not to protect creditors. We know that when the 84 amendments happened. What's the greater harm here? The greater harm between having a debtor be leveraged by the threat of involuntary bankruptcy, which is about the biggest leverage you can have, versus taking away or at least delaying that remedy, when a creditor has other remedies, right? The creditor can go get prejudgment attachment. A state taxing authority has about as many remedies as I can think of, aside from involuntary bankruptcy. So if you're going to delay that versus subject the debtor to the threat, being very careful about how you subject the debtor to that threat, I think, is critical. And we know that's important from the legislative history in 84. So your position would be that you would literally have to amend the statute by inserting the word material to comport with Montana's view? Or there are other ways you could do it. For example, it could have said a portion, right? Instead of referring to the claim as a whole, the statute could have said as long as a portion of the claim is undisputed, and then you have the statutory minimum. But we're talking about claim, one claim. It doesn't say a portion. So there are lots of ways to make that clear, and especially when focus media came out, if Congress wanted to make it clear that what focus media said is what we meant, they would have done that much more specifically. This statute on its face very clearly is contrary, I think, to focus media. And then I think, lastly, in terms of policy, it's important to think about what's the impact outside of an involuntary bankruptcy case before one happens. And if you use the .1 hypothetical, the creditor could just waive the $100, right? If there was only $100 in dispute on a $100,000 claim, if the creditor felt like it was that important to get into involuntary bankruptcy, they could just say, you know what, we're not going to assert the $100 anymore. The debtor can't do that on the flip side because the only way to deal with it in Mr. Blix's situation, right, would be to pay the $219,000, eliminate the allegedly undisputed portion. So, counsel, let's suppose that you persuaded me on Montana. That still doesn't get you home. You still need one more. You've still got to knock one more out, don't you? I don't think we do, and here's why. We have some unique facts in this case, which are that there are four total potential creditors to consider. Three of them have withdrawn and said, we're not prosecuting this involuntary petition. We're done. We're out of here. Whether it's because we settled or otherwise, we're not doing this. And Section 303J of the Bankruptcy Code says that the bankruptcy court can dismiss an involuntary petition for want of prosecution. So, if Montana's not qualified to prosecute this involuntary petition, there's nobody left to prosecute it, and therefore it would be dismissed under 303J anyway. So even if the bankruptcy court was wrong and the district court was wrong about the other non-Montana creditors, at best that's harmless error or a moot point because there's no way to prosecute this unless Montana's qualified, and Montana's not qualified. So that gets us away from the other issues, which I'm also happy to talk about. What's the timing of their withdrawal of their desire to pursue these claims? So California and Idaho withdrew almost immediately after filing the petition, and they withdrew NUNC protunc, which would be retroactive to the petition date. The Yellowstone Club withdrew within the last year or so, so many years after the fact. They also withdrew their joinder, NUNC protunc, to the petition date. I don't think that timing matters for purposes of want of prosecution because, again, that's not really a were they originally qualified question. It's a different question. It's is there somebody here to prosecute this petition because there has to be somebody to do that, somebody withstanding, someone that's articulating because there are other issues we haven't even gotten to in this case, whether Mr. Blix is paying his debts as they came due, which is another requirement, and the petition needs to be filed in good faith. Bankruptcy court didn't reach either of those issues, and neither did the district court, therefore, because it found that we didn't have enough qualifying petitioning creditors. When your view, it all boils down to Montana. I think if you rule that Montana was not eligible, the court doesn't need to go any further. If we look at the other issues, and there are about four of them, I think, the 12-creditor requirement, California and Idaho's qualifications, the Yellowstone Club's qualifications, and then the issue of NUNC protunc withdrawal, all those things are on solid ground. 12-creditor requirement didn't get to it in the opening, but the bankruptcy court and the district court cited extensive things in the record, evidence in the record about the number of creditors Mr. Blix had. It was his burden to identify 12 creditors, and then it was Montana's burden to show that they didn't qualify. They didn't satisfy that burden. There's nothing that would show that was a clearly erroneous holding, and so, therefore, you need three, and Montana almost seems to concede that they focus on trying to prove up three creditors. California and Idaho, an important thing about Idaho that wasn't noted is that Idaho's claim was based on three tax years, 05, 07, and 08. The judgment that they got was for 07 and 08. It was not for the 2005 year, yet the claim that they used to file the involuntary petition was for the full amount of liability they asserted for all three of those years. So, number one, Marciano doesn't address a default judgment. It specifically carves that out, but number two, there was no judgment on the 2005 tax year, and so you get back to dispute as to liability or amount. The claim they tried to use was not based on a judgment for the full amount of the claim. It was only partial. California, I think, is even clearer, and I think that's why Judge Dorsey used that as part of the discussion and didn't reach Idaho because there's California's books and records which show that there was a dispute raised. It had to do with the loss carried forward or carried back, and it's in the record. Whether it was going to succeed or not, that's not the issue under Vortex. So, I see my time's up. I think the Court, if there are further questions, happy to answer. Thank you. Thank you, Your Honor. Mr. Butler. Yes, Your Honor. Their position as to standing is absolutely wrong. The Ninth Circuit is clear. The jurisdiction of the court exists as of the filing of the involuntary petition. Subsequent acts cannot divest the bankruptcy court, the Federal court. Well, jurisdiction would be very different from the question as to whether anybody left to prosecute. Those are two different questions. Yes, Your Honor. We may have jurisdiction, but there may not be anybody in the courtroom. Whether or not we would still have standing, Your Honor, is an interesting issue. Quite frankly, that's not part of the facts here. It hadn't been addressed in the past. I would submit that being part of that original group gives us standing to take the case to its conclusion under 303B. You know, the difficulty with that is you can have standing at the outset, and standing isn't really the ultimate. I mean, it could become moot, and there's a whole series of other things that can happen that basically say case over. So you're even, although you're correcting your statement of initial standing, that doesn't necessarily resolve the question, does it? But I think that's the basis for the Ninth Circuit holdings, that subsequent actions don't impact the original filing. I think when you get down to it, it goes way back to the 1939 case in Cook that was cited by Vortex. The subsequent paying off of a creditor does not impact the filing of the involuntary because it impacts the other creditors. And I think that's the answer to that. The other thing, Your Honor, Congress has the 1 percent issue is a red herring. Congress has addressed that. It set a limit, a dollar limit in 303B, and that's the limit. I don't think that the materiality in the $219,000 is definitely material as compared to that limit. Your Honor, as far as California, please keep in mind, I'm sorry, I'm over my time. Finish up with California. As far as California, keep in mind, and I keep going back to this one, that the entry that was referenced by the district court dealt with something that occurred, a conversation that occurred in 2009 regarding a potential loss carryback for 2008. Yet California's own records in March of 2011 in its notice of tax due show that the liability still existed. That's nothing more than a discussion. And if you think about it, what would have been the best evidence in 2013 to show that there was truly a loss carryforward from 2008, a loss carryback? It would be the filing of the 2008 California tax return, or the 2009, or the 2010, or the 2011. None of that was of the record. Thank you. Thank you, Your Honor. With that, I submit the case. Thank you. The case of Montana Department of Revenue v. Blixith is submitted. Thank you both for coming and presenting your arguments here in Seattle.
judges: Hawkins, McKeown, Bybee